UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ALEX IVEY,<br><br>    Plaintiff,<br><br>    vs.<br><br>MIKE MCDONALD, Warden,<br><br>    Respondent. | Case No: C 10-5828 SBA<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner Alex Ivey was charged in the Alameda County Superior Court with one count of murder, Cal. Pen. Code § 187(a), and one count of possession of a firearm by a felon, id. § 12021(a)(1)). Use of a firearm enhancements were also charged, id. §§ 12022.5 (a)(1), 12022.53(b), (c) & (d)), as well as a special circumstance allegation for murder during the commission or attempted commission of robbery, id. § 190.2(a)(17)(A). In October 2004, Petitioner was convicted by a jury as charged and was later sentenced to life without the possibility of parole.

This matter is now before the Court for consideration of Petitioner's petition for a writ of habeas corpus under 28 U.S.C. § 2254. Through counsel, Petitioner raises three claims. The first two claims allege that the state courts violated Petitioner's rights to due process and equal protection based on the court clerk's failure to maintain jury questionnaires, which, in turn, precluded him from making an effective Batson/Wheeler challenge in the trial court and on appeal. The third claim alleges the denial of due process based on instructional error. For the reasons discussed below, the petition is DENIED as to all claims.

I. **BACKGROUND**

A. FACTUAL SUMMARY

The following facts are taken from the Court of Appeal's initial decision in 2005:

> On February 21, 2003, Ernesto Ortega was shot to death near the Quarter Pounder Giant Burger in Oakland. Defendant and Jade Carter were charged with Ortega's murder. Carter was found guilty of the murder as an aider and abettor and testified for the prosecution at defendant's trial, prior to her sentencing. Her understanding was that she would receive a sentence of thirteen years for voluntary manslaughter and robbery, with a firearm arming enhancement (rather than twenty five years to life for first degree murder), if she testified truthfully.
>
> Carter testified that she was a long-time friend of defendant and was at his house on February 21. They eventually went out to an Oakland club and to a "side show" with one of defendant's friends, named John, and another fellow. They returned to defendant's house and after Carter indicated she was hungry, John drove them to Giant Burger at 81st and East 14th streets. On the way to Giant Burger, there was no mention of robbing anyone. When they arrived at Giant Burger, there were some ten or fifteen people in the parking lot at Giant Burger, including the victim. Carter got out and went to the counter at Giant Burger; defendant got out and walked around the side of Giant Burger facing International Boulevard.
>
> While she was waiting for her food to be prepared, Carter heard defendant call to her, saying, "Niecy [Carter's nickname], come here, check it out." She went around the side of the building and found defendant pointing a gun at a Mexican man. Defendant told the man, "break yourself," a slang term for "give up what you got." The man just stood there and Carter told him, "Give him what he want." The man then ran toward the opposite side of the building. Defendant chased and caught the man, and hit him in the side of the head with the gun. Almost immediately, as defendant was bringing his hand back again, the gun went off. Carter asked defendant what happened and he replied that it had been an accident and that the gun had slipped. She denied seeing defendant go into the man's pockets or take anything from him. Defendant ran to the car; Carter went and picked up her food and never looked back to see what happened to the victim. Once she got into the car, she heard John ask defendant what had happened and defendant replied, "Nobody don't know nothing." They left the area and ultimately went their separate ways. A day or two later, Carter saw defendant at Booker's liquor store. They discussed the incident at Giant Burger and agreed to say that defendant had gone to the side of the Giant Burger building to urinate, and that two Mexicans "got into it," and that one had shot the other. Carter subsequently gave inconsistent statements about the incident to the police, at first claiming she knew nothing of the incident and then saying that after she ordered her food, defendant called her to the side of the building where she saw

two Mexicans arguing and fighting; one pulled a gun and shot the other. She later indicated that defendant had been involved somehow in the argument with the Mexicans. He had somehow ended up with the gun and it went off.

John King's preliminary hearing testimony was read to the jury (he testified under a grant of immunity). He indicated that he went to defendant's house in the early hours of February 21 with George Benson; they picked up defendant and Carter there. They went to a club and then returned to defendant's house, and then went to a "side-show." They again returned to defendant's house. Carter indicated she wanted something to eat, so they went to Giant Burger. Carter and defendant got out of the car; King and Benson remained in the car and smoked marijuana. King thought he heard a gunshot and a few minutes later defendant and Carter returned to the car. Defendant was a little shaky when he returned to the car. King did not see a gun. They said nothing happened, so King just drove off. He drove back to defendant's house and dropped him off and dropped Carter off at a different location.

Jerome Burns had been picked up on a probation violation and notified police he would provide information about the case if they did something about his probation violation. Burns testified at trial and indicated that on February 21 he encountered "Alley Al" (defendant's street name) in front of Booker's liquor store.4 "Alley Al" told Burns in February that he had shot someone and thought he was dead. "Alley Al" had been trying to rob "a Mexican," but the robbery backfired and the gun went off accidentally. Defendant said he approached the Mexican at Giant Burger and asked for money; when the Mexican did not comply, he hit the man with a gun and the gun went off. The man fell to the ground.

Defendant's various statements to the police were introduced at trial. In the first version, after indicating his nickname was "Alley Al," defendant said he went to the Quarter Pounder at 80th and International on the date in question, along with Carter, King, and "George." Carter went to order food; defendant went to the International Boulevard side of the Quarter Pounder to go to the bathroom. Afterward, he and Carter returned to the car and they all left. He then changed his story to say that when he went to relieve himself, he saw two men arguing, one Latin and the other either a light-skinned Black or Latin. Defendant called Carter over to watch the argument. Carter saw a gun, so they left because they thought that "something" might happen. They did not hear a gunshot. He later said he saw one of the men with a gun and thought one had been trying to take something from the other. Defendant continued to maintain that he did not have a gun.

Defendant later changed his story again and indicated that when he went to the side of the building to urinate, a Mexican man approached him and told him to "break himself." The man pushed defendant against the gate; defendant thought he was being robbed. Defendant thought the man had a knife in his

**1**
**2**
**3**
**4**
**5**
**6**
**7**
**8**
**9**
**10**

> pocket. Defendant happened to have a nine-millimeter Glock with him, which he pulled out. As defendant turned toward the Mexican man, the gun accidentally discharged and shot the man.
>
> Defendant later made a tape-recorded statement that was similar to this last account, except that he indicated that when he reached for his gun, the Mexican man lunged and grabbed the gun, which went off. The Mexican man fell in the street. On their way home, King asked defendant what had happened and defendant told him: "I think I shot him."
>
> Thomas Rogers, M.D., testified that he performed an autopsy on the victim's body; the cause of death was a gunshot wound to the back torso, which exited the victim's right arm. The gunshot wound on the victim's body did not come from the front. There was no gunshot residue or stippling near the entry wound, but Dr. Rogers could not say from what distance the shot had been fired.

Exh. 8 at 2-5 (footnotes omitted).

### B.   PROCEDURAL HISTORY

The Alameda County District Attorney charged Petitioner with one count of first degree murder and one count of possession of a firearm by a felon, along with use of a firearm enhancements and a special circumstance allegation that the murder was committed during the commission or attempted commission of robbery.

During jury selection, the prosecution exercised peremptory challenges against two prospective African-American jurors. Ex. 5 at 16. The prosecution excused W.H., an African-American male who had been seated, and L.R., an African-American female prospective alternate juror. Ex. 16 at 2-3. In response, Petitioner challenged the prosecution's actions by making a motion under People v. Wheeler, 22 Cal.3d 258 (1978) and Batson v. Kentucky, 476 U.S. 79 (1986).[1] Ex. 5 at 16. The trial court denied the motion on the ground that Petitioner had failed to present a prima facie case of racial bias. Id. at 16, 23. The case proceeded to trial, and on October 28, 2004, a jury convicted

---

[1] Batson holds that exercising peremptory challenges solely on the basis of race offends the Equal Protection Clause of the Fourteenth Amendment. See United States v. Martinez-Salazar, 528 U.S. 304, 315 (2000). Wheeler is the California analog to Batson. Aleman v. Uribe, 723 F.3d 976, 980 (9th Cir. 2013).

petitioner on all counts and allegations. On February 1, 2005, the trial court sentenced Petitioner to life in prison without the possibility of parole. Ex. 8 at 1.

Petitioner appealed his conviction and sentence to the California Court of Appeal. Ex. 5. On appeal, Petitioner argued that the trial court applied the wrong legal standard to the question of whether he had made a prima facie showing of purposeful discrimination under Batson. Ex. 5 at 23. As a remedy, Petitioner requested the reversal of the judgment, or alternatively, a limited remand with orders that the trial court assume that Petitioner had established a prima facie case. Id. at 27. Separately, Petitioner alleged that the trial court erred in failing to give CALJIC No. 8.80.1 (Special Circumstances—Introductory) and CALJIC No. 8.81.17 (Special Circumstances—Murder in Commission of [an Enumerated Felony]). Id. at 35.

On February 23, 2006, the court of appeal issued an unpublished disposition in which it found that the trial court erred in adjudicating Petitioner's Batson/Wheeler motion. Ex. 8 (People v. Ivey, No. A109161, 2006 WL 418617, at *3 (Cal. Ct. App. Feb. 23, 2006 ("Ivey I")). The court held that because the trial court had failed to articulate the legal standard it was applying, the court of appeal assumed that the trial court had applied the standard set forth in People v. Johnson, 30 Cal. 4th 1302 (2003). However, in the intervening time period, the Supreme Court subsequently clarified that the correct standard for a prima facie case under Batson was that the moving party must produce "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." Johnson v. California, 545 U.S. 162, 170 (2005). To ensure that Petitioner's Batson/Wheeler motion was adjudicated under the correct standard, the court ordered "a limited remand to permit the prosecutor to articulate her reasons for excusing the jurors in question and to give the trial court the opportunity to assess the validity of those reasons." Ex. 8 at 6. The court, however, rejected Petitioner's claim of instructional error. Though finding that the trial court erred in failing to sua sponte give CALJIC Nos. 8.80.1 and 8.81.17, the court concluded that such error was harmless under Chapman v. California, 386 U.S. 18, 24, (1967). Ex. 8 at 7-18.

On remand, the prosecutor explained to the trial court that she had not previously articulated her race-neutral reasons for excusing the jurors in question because she thought "they were so obvious [she] didn't feel the need to make a record." Ex. 16 at 5. As to W.H., the prosecutor believed that he was biased against the prosecution, because, among other things, the Alameda County District Attorney's Office previously prosecuted his brother for rape. Id. at 6. W.H. also had expressed a disdain for the criminal justice system in general. Id.

Similarly, the prosecutor believed that L.R. would be biased, inter alia, based on her opinion that the "system" works "if you have money and an important attorney." Id. at 7. L.R. also revealed that she lived with her godchild, whom she felt was poorly treated at the Santa Rita County Jail ("Santa Rita"), the same facility where Petitioner was then being housed. The prosecutor believed that L.R.'s comments regarding Santa Rita and her other responses suggested that she had a negative view of law enforcement. Id. The prosecutor also was concerned that L.R. had been the victim of multiple robberies but did not always report them to the police, which the prosecutor interpreted as an indication that L.R. was not willing to hold people accountable for their actions. Id.

The trial court considered extensive argument by the parties. Ex. 12. Judge Julie Conger again denied Petitioner's Batson/Wheeler motion, stating:

> I have not only reviewed your explanations, [prosecutor], but I've also reviewed the transcripts of the voir dire, and I do find that your reasons are valid and not race-related. I do not believe that you [defendant] have made a prima facie case—or a showing that there's evidence sufficient to have me draw an inference that these challenges were based upon racial discrimination. Therefore, my original ruling on the challenges is sustained and reaffirmed.

Ex. 16 at 8.

Petitioner appealed the adverse ruling a second time to the court of appeal, which, on June 15, 2009, issued an unpublished opinion affirming the judgment. Ex. 16 (People v. Ivey, No. A123368, 2009 WL 1668994 (Cal. Ct. App. 2009) ("Ivey II")). The court explained that "we agree [] that the record does not give rise to an inference of

discriminatory purpose, and the record thus supports the trial court's conclusion that defendant did not make a prima facie showing of discrimination." Id. at 9. As to prospective juror L.R., the court also found that "because no alternate jurors were ever substituted in, any Batson/Wheeler violation as to prospective alternate juror L.R. could not possibly have prejudiced defendant." Id. at 12.

The court noted that Petitioner did not directly dispute the trial court's finding regarding his failure to establish a prima facie case under Batson, but instead relied on the argument that the trial court's failure to retain the jury questionnaires deprived him of a meaningful Batson hearing on remand and on appeal. Id.; see also Ex. 13 at 21-34. More specifically, Petitioner argued that the lack of questionnaires prevented him from conducting a comparative analysis in connection with his Batson/Wheeler challenge. Ex. 16 at 10. The court of appeal rejected that contention, stating: "What defendant's argument ignores is that a reviewing court need not engage in comparative juror analysis where, as here, the trial court has denied defendant's Wheeler motion after concluding that defendant failed to make out a prima facie case." Id. A comparative juror analysis, the court explained, was germane to a third stage analysis under Batson, not to a first stage analysis where the inquiry is on whether the defendant has made a prima facie showing. Id. at 10-11.[2] Petitioner thereafter filed a petition for review, which was denied by the California Supreme Court on September 23, 2009. Exhs. 17 and 18.

Petitioner timely filed the instant petition in this Court. Dkt. 1. The Petition alleges three claims: (1) denial of due process and equal protection based on the destruction of the jury questionnaires which precluded Petitioner from having a fair hearing on remand on his Batson/Wheeler motion; (2) denial of due process and equal protection based on the destruction of the jury questionnaires which precluded Petitioner from having a fair appeal from the denial of his Batson/Wheeler motion; and (3) denial of due process and right to a

---

[2] Citing Supreme Court authority, the Ninth Circuit also has recognized that a comparative juror analysis "is an established tool at *step three* of the Batson analysis for determining whether facially race-neutral reasons are a pretext for discrimination." Crittenden v. Ayers, 624 F.3d 943, 956 (9th Cir. 2010) (citing cases, emphasis added).

1 fair trial based on the trial court's failure to give CALJIC Nos. 8.80.1 and 8.81.17, which
2 allowed the jury to make a "true" finding on the robbery special circumstance allegation
3 with being advised as to the elements for such a finding beyond a reasonable doubt.  The
4 Petition is fully briefed and is ripe for adjudication.

5 **II.     LEGAL STANDARD**

6        Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28
7 U.S.C. § 2254, a federal court cannot grant habeas relief with respect to any claim
8 adjudicated on the merits in a state-court proceeding unless the proceeding "resulted in a
9 decision that was *contrary to*, or involved an *unreasonable application of*, clearly
10 established Federal law, as determined by the Supreme Court of the United States."  28
11 U.S.C. § 2254(d)(1) (emphasis added).

12       A state court decision is "contrary to" clearly established federal law "if the state
13 court applies a rule that contradicts the governing law set forth in [Supreme Court] cases or
14 if the state court confronts a set of facts that are materially indistinguishable from a
15 decision of [the Supreme] Court and nevertheless arrives at a result different from [its]
16 precedent."  Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (internal quotation marks
17 omitted).  Relief under the "unreasonable application" clause is appropriate "if the state
18 court identifies the correct governing legal principle from [the Supreme] Court's decisions
19 but unreasonably applies that principle to the facts of the prisoner's case."  Id.  Habeas
20 petitioners bear the burden of showing that a state court's decision applied some Supreme
21 Court precedent in an objectively unreasonable manner.  Woodford v. Visciotti, 537 U.S.
22 19, 25 (2002) (per curiam).

23       On federal habeas review, the district court reviews the decision of the highest state
24 court to address the merits of the petitioner's claim in a reasoned decision.  See Ylst v.
25 Nunnemaker, 501 U.S. 797, 803-804 (1991).  In the absence of a decision from the highest
26 state court, the Court "looks through" to the "last reasoned decision" addressing the
27 particular claim.  Id.; Shackleford v. Hubbard, 234 F.3d 1072, 1079, n.2 (9th Cir. 2000).
28 Here, the Court of Appeal's decision in Ivey II is the last reasoned decision as to

1 Petitioner's first and second claims regarding the jury questionnaires and <u>Ivey I</u> is the last
2 reasoned decision to address Petitioner's third claim of instructional error.

## III. DISCUSSION

### A. DESTRUCTION OF JURY QUESTIONNAIRES[3]

#### 1. Analysis

The Equal Protection Clause forbids the challenging of potential jurors solely on account of their race.  See <u>Batson</u>, 476 U.S. 79; <u>Wheeler</u>, 22 Cal.3d 258.  A <u>Batson/Wheeler</u> challenge entails a three-step analysis.  <u>Aleman v. Uribe</u>, 723 F.3d 976, 980 (9th Cir. 2013).  "At the first step, the defendant must make a prima facie showing that the prosecutor exercised a peremptory challenge based on race."  <u>Id.</u>  "To establish a prima facie case under <u>Batson</u>, [the party making the challenge] must produce evidence that 1) the prospective juror is a member of a cognizable group; 2) counsel used a peremptory strike against the individual; and 3) 'the totality of the circumstances raises an inference that the strike was motivated' by the characteristic in question."  <u>SmithKline Beecham Corp. v. Abbott Labs.</u>, 740 F.3d 471, 476 (9th Cir. 2014).  "[A] defendant satisfies the requirements of <u>Batson</u>'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred."  <u>Johnson</u>, 545 U.S. at 170.

"Second, if the trial court finds the defendant has made a prima facie case of discrimination, the burden then shifts to the prosecution to offer a race-neutral reason for the challenge that relates to the case."  <u>Green v. LaMarque</u>, 532 F.3d 1028, 1029-30 (9th Cir. 2008). "Third, if the prosecutor offers a race-neutral explanation, the trial court must decide whether the defendant has proved the prosecutor's motive for the strike was purposeful racial discrimination."  <u>Id.</u>  "When conducting the analysis at the third step, the trial court must decide not only whether the reasons stated are race-neutral, but whether they are relevant to the case, and whether those stated reasons were the prosecutor's genuine reasons for exercising a peremptory strike, rather than pretexts invented to hide

---

[3] Because Claims One and Two are intertwined, the Court analyzes them together.

purposeful discrimination." Id.  This inquiry requires the court to "undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," id., (internal quotations and citations omitted), such as conducting a comparative juror analysis to determine whether the basis upon which a prosecutor challenged a disputed juror is pretextual, see Kesser v. Cambra, 465 F.3d 351, 360-61 (9th Cir. 2006).

Petitioner does not specifically challenge the trial court's determination that he failed to establish a prima facie case under Batson.[4]  Rather, he argues that the court clerk's failure to preserve the jury questionnaires of the stricken jurors deprived him of the ability to have a meaningful hearing on his Batson/Wheeler motion and meaningful appellate review thereron.  Pet. at 3-6.  According to Petitioner, those questionnaires were necessary for him to conduct a comparative juror analysis to establish that the prosecution exercised her two peremptory challenges on account of the prospective jurors' race.  In Ivey II, the court of appeal rejected that argument on the ground that a comparative juror analysis is only pertinent at the third step of the Batson analysis, *not* whether Petitioner had made a prima facie showing at stage one.  Ivey II, 2006 WL at *6.  The court concluded that "[b]ecause we need not engage in comparative juror analysis here, the absence of juror questionnaires (which would be only one piece of evidence relevant to a comparative analysis in any event) does not prejudice defendant.  The absence of juror questionnaires likewise did not deprive defendant of a fair hearing on remand, where the trial court was not obligated to engage in comparative juror analysis (and, indeed, defendant did not request that such analysis be conducted)." Id.

In his Petition, Petitioner argues that the original remand in Ivey I was specifically for a stage three Batson analysis.  He accuses the appellate court in Ivey II of engaging in a

---

[4] "A state court's finding that the prosecutor did not engage in purposeful discrimination is reviewed under the deferential standard set forth in 28 U.S.C. § 2254(d)(2)." Jamerson v. Runnels, 713 F.3d 1218, 1224 (9th Cir. 2013).  As noted, Petitioner does not challenge the trial court's finding that he failed to establish a prima facie case.  Nor does he dispute that a comparative analysis is only germane at stage three of the Batson analysis.  Rather, he claims that the action was remanded in Ivey I for a stage three analysis, and that to conduct such an analysis, he needed the jury questionnaires.

1  "sleight of hand" by recasting the original remand as one for a stage one analysis as a
2  means of sidestepping the issues created by the missing questionnaires. Pet. at 24. This
3  contention lacks merit. In <u>Ivey I</u>, the court clearly states that it was remanding the action to
4  ensure that the trial court was applying the correct legal standard "for the prima facie case,"
5  as set forth by the Supreme Court in <u>Johnson</u>, 55 U.S. 162. Ex. 6 at 6. Although Petitioner
6  had specifically requested in his appellate brief that any remand by the court of appeal be
7  with directions that "[the trial court] will assume the defendant has established a prima
8  facie case," Ex. 5 at 27, no such mandate was included by the <u>Ivey I</u> court in its disposition.
9       Moreover, in <u>Ivey II</u>, the court expressly considered and rejected Petitioner's
10 contention that the initial remand was for a stage three analysis. The court explained that
11 the mere fact that the trial court allowed the prosecutor to explain her reasons for
12 dismissing the two prospective jurors did not transmute the proceeding into a stage three
13 inquiry. The court held: "[W]e do not agree that this necessarily converted this into a
14 'stage three' case. The California Supreme Court has 'encouraged trial courts to ask
15 prosecutors to give explanations for contested peremptory challenges, even in the absence
16 of a prima facie showing.' . . . Where, as here, 'a court ultimately concludes that a prima
17 facie showing has not been made, the request for and provision of explanations does not
18 convert a first-stage <u>Wheeler/Batson</u> case into a third-stage case.'" Ex. 16 at 11 n.9
19 (citations omitted). Upon reviewing the record, the Court finds no error in the <u>Ivey II</u>
20 court's determination that the remand was limited to a stage one analysis. Accordingly, the
21 Court finds that the court of appeal's determination that the trial court did not err in denying
22 Petitioner's <u>Batson/Wheeler</u> motion was neither contrary to, nor an unreasonable
23 application of, clearly established Supreme Court precedent. Relief on Claims One and
24 Two is DENIED.
25     **B.**     **FAILURE TO INSTRUCT**
26      Petitioner's third claim is that he was denied due process as a result of the trial
27 court's failure to give CALJIC No. 8.80.1 (Special Circumstances—Introductory) and
28 CALJIC No. 8.81.17 (Special Circumstances—Murder in Commission of [an Enumerated

- 11 -

Felony]). A trial court's failure to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding. See Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988). Rather, to obtain federal collateral relief for instructional error, a petitioner must show that the challenged instruction or lack of an instruction, by itself so infected the entire trial that the resulting conviction violates due process. See Estelle v. McGuire, 502 U.S. 62, 72 (1991). Alleged instructional error may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. United States v. Frady, 456 U.S. 152, 169 (1982). On federal habeas review, reversal is warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).[5]

Here, the trial court failed to sua sponte instruct the jury with the two aforementioned special circumstances instructions. Ex. 8 at 7. On appeal, Petitioner argued that CALJIC No. 8.80.1 was necessary so that the jury would know that a special circumstance allegation, to be found true, must be proven beyond a reasonable doubt. The Ivey I court held that Petitioner was not harmed by the court's failure to give CALJIC No. 8.80.1 because other instructions—namely, the general reasonable doubt instruction (CALJIC No. 2.90) and special instructions regarding the firearm enhancements (CALJIC Nos. 17.19 and 17.19.5)—adequately instructed jurors regarding the requisite burden of proof. Id. at 12-13. The court explained that prior California cases have held general instructions on reasonable doubt are sufficient to inform the jury to apply the reasonable doubt standard to special circumstance allegations. In addition, the court noted that the jury was never instructed as to any other standard of proof. Id. at 13.

---

[5] The United States Supreme Court has clarified that, when a state appellate court has undertaken a Chapman harmless error review, as the Court of Appeal did here, the federal district court reviewing the decision under § 2254 applies the Brecht harmless error analysis. See Fry v. Pliler, 551 U.S. 112, 120 (2007) ("Brecht obviously subsumes AEDPA/Chapman review").

1    The other instruction that Petitioner contends should have been given at trial is
2  CALJIC No. 8.81.17, the felony-murder special circumstance instruction.  The instruction
3  requires: (1) that the murder be committed while the defendant was engaged in the
4  commission or attempted commission of the enumerated felony, and (2) that the murder
5  was committed in order to carry out or advance the commission of the enumerated felony
6  or to facilitate the escape therefrom or to avoid detection.  Id.  In other words, the special
7  circumstance is not established if the enumerated crime was merely incidental to the
8  commission of the murder.  On appeal, the court held that the failure to give CALJIC No.
9  8.81.17 was harmless.  Id. at 18.

10    As to the first part of that instruction, the court explained that the jury was read
11 CALJIC No. 8.21, a felony murder instruction which instructs that "that the unlawful
12 killing of a human being, whether intentional, unintentional, or accidental, which occurs
13 during the commission or attempted commission of the crime of robbery, is murder of the
14 first degree when the perpetrator has the specific intent to commit that crime."  Id. at 13.
15 The jury also was given CALJIC No. 8.21.1 to explain that "[a] robbery is still in progress
16 while the perpetrator is in possession of the stolen property and fleeing in an attempt to
17 escape, or so long as immediate pursuers are attempting to capture the perpetrator or to
18 regain the stolen property."  Id.  The court held that these two instructions, in tandem, were
19 sufficient to instruct jurors "[a]s to the first portion of CALJIC No. 8.81.17, which indicates
20 as applicable in this case that in order for the special circumstance to be found true the
21 prosecution must prove that the murder was committed while the defendant was engaged in
22 the commission or attempted commission of a robbery . . . ."  Id. at 14.  In addition, the
23 court noted that that "the jury specifically found that defendant committed the murder while
24 engaged in the commission or attempted commission of a robbery, by returning a special
25 finding on the special circumstance allegation[.]"[6]  Id.

---

[6] The jury's verdict included the specific finding:  "We, the jury, further find that the murder of Ernesto Ortega WAS committed by the defendant ALEX IVEY while the said defendant was engaged in the commission or attempted commission of ROBBERY within the meaning of section 190.2(a)(17)(A). Ex. 8 at 13-14.

The court further found that the failure to give the second paragraph of CALJIC No. 8.81.17—which instructs that the murder was committed in order to carry out or advance the commission of the enumerated felony or to facilitate the escape therefrom or to avoid detection—was harmless because the evidence presented at trial did not compel its use. The gist of the second paragraph of CALJIC No. 8.81.17 is that "the jury is required to find that the robbery was not merely incidental to the murder." Ex. 8 at 15. However, there was "no significant evidence of any motive for the murder other than" the robbery, and, in fact, the evidence showed that the robbery was the "primary purpose" of Petitioner's criminal conduct. Id. Given the state of the record, the court reasoned that no reversible error resulted from the omission of the second paragraph of CALJIC No. 8.81.17. Id.

In his Petition, Petitioner makes a conclusory argument that the trial court's instructional error had a substantial and injurious influence on the jury's verdict. Pet. at 36; Traverse at 14. In particular, Petitioner contends that the court of appeal erred in relying on the jury's special circumstance verdict finding (i.e., that Petitioner committed the murder while engaged in the commission or attempted commission of robbery) as evidence that the error was harmless. Id. However, Petitioner overlooks that the court of appeal also provided a detailed analysis regarding how the trial court's failure to give CALJIC No. 8.80.1 and CALJIC No. 8.81.17 could not have affected the verdict in view of the other instructions given. See Brecht, 507 U.S. at 637.

Petitioner also argues that the Court of Appeal ignored the testimony of two witnesses, that the killing was accidental. Pet. at 36. However, Petitioner fails to show how such testimony would have altered the verdict had the two omitted instructions been given. Moreover, as the court of appeal explained, intent is not an element of the felony murder rule. Ex. 8 at 17; James v. Borg, 24 F.3d 20, 25 (9th Cir. 1994) ("intent to kill is not an element of the felony-murder special circumstance when the defendant is the actual killer.").

In sum, Petitioner has failed to show that the trial court's omission of the jury instructions at issue had a substantial and injurious effect or influence in determining the jury's verdict. Habeas relief on Claim Three is DENIED.

## IV. CERTIFICATE OF APPEALABILITY

No certificate of appealability is warranted in this case. For the reasons set out above, jurists of reason would not find this Court's denial of Petitioner's claims debatable or wrong. See Slack v. McDaniel, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure. See Rule 11(a) of the Rules Governing Section 2254 Cases.

## V. CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED THAT:

1. The Petition for Writ of Habeas Corpus is DENIED as to all claims, and a certificate of appealability will not issue. Petitioner may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

2. The Clerk of the Court shall enter judgment, terminate all pending matters.

IT IS SO ORDERED.

Dated: 3/31/14

*Saundra B Armstrong*
SAUNDRA BROWN ARMSTRONG
Senior United States District Judge